IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ORRICK WILSON,
   Plaintiff,

vs.         Case No. 3:09cv310/RV/CJK

DR. ROGER BROWNE, et al.,
   Defendants.

_____

## REPORT AND RECOMMENDATION

This prisoner civil rights case is before the Court upon defendants Browne and Hemphill's motion for summary judgment (docs. 107, 108) and defendants Nguyen and Nichols' motion for summary judgment (doc. 118). Plaintiff has responded in opposition to the motions (docs. 115, 116, 124). Upon review of the motions, responses, summary judgment evidence and relevant legal authorities, the undersigned recommends that defendants' motions be granted.

BACKGROUND AND PROCEDURAL HISTORY

Plaintiff is an inmate of the Florida penal system currently confined at the Reception and Medical Center in Lake Butler, Florida. On December 1, 2009, plaintiff filed a *pro se* second amended civil rights complaint under 42 U.S.C. § 1983, claiming that he was denied adequate medical care for a 2005 head injury, in violation of the Eighth Amendment. (Doc. 9, pp. 5-7). Plaintiff's second amended complaint names six defendants, who have been identified as follows: Dr. Roger Browne, Dr. Robert Hemphill, Dr. Nguyen, ARNP Nichols, Dr. Clifford Claude Adam and Dr. Marc Tennenbaum. (*Id.*, p. 1; Doc. 35; Doc. 45). Plaintiff alleges that as a result of defendants' refusal to conduct a neurological examination following his head injury,

plaintiff now suffers from severe headaches and dizzy spells, visible twitching of nerves, numbness in both hands and arms, numbness of the entire left side of his body, and the loss of 50% of his previous dexterity, mobility and motor skills. (Doc. 9, p. 7). As relief, plaintiff seeks compensatory and punitive damages, as well as an examination and treatment by a neurologist. (*Id*.).

It is undisputed that Dr. Browne was a physician at Everglades Correctional Institution ("Everglades CI") at times relevant to the complaint. (Doc. 108, Browne Certification ¶ 2). Dr. Hemphill is the Medical Director of Charlotte Correctional Institution ("Charlotte CI"). (Doc. 108, Hemphill Aff. ¶ 2). Dr. Nguyen was a Senior Physician at Union Correctional Institution ("Union CI") at times relevant to the complaint. (Doc. 118, Ex. D, Nguyen Aff. ¶ 1). Nurse Nichols is an Advanced Registered Nurse Practitioner at Santa Rosa Correctional Institution ("Santa Rosa CI"). (Doc. 118, Ex. F, Nichols' Aff. ¶¶ 1-3). Dr. Adam was the Chief Medical Officer of Franklin Correctional Institution ("Franklin CI") at times relevant to the complaint. (Doc. 58, pp. 1-2). Dr. Tennenbaum was the Chief Medical Officer of South Bay Correctional Facility ("South Bay") at times relevant to the complaint.

On July 22, 2011, defendants Browne and Hemphill filed motions for summary judgment with incorporated statements of undisputed material facts and supporting evidence (docs. 107, 108, 113), to which plaintiff responded (docs. 115, 116). On August 15, 2011, defendants Nguyen and Nichols filed a joint motion for summary judgment with incorporated statement of undisputed material facts and supporting evidence (doc. 118), to which plaintiff responded (doc. 124). Each motion will be addressed in turn.

## LEGAL STANDARDS

Summary Judgment Standard

In resolving a summary judgment motion, the court "reviews the evidence and draws all reasonable inferences in the light most favorable to the non-moving party." *Owens v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248, 106 S. Ct. at 2510. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence or conclusory allegations is insufficient. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986).

Eighth Amendment Standard

The government has a constitutional duty to provide minimally adequate medical care to prisoners. *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991). Nevertheless, not every prisoner claim of inadequate medical care states an Eighth Amendment violation. *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S. Ct. 285, 291, 50

L. Ed.2 d 251 (1976).  To prevail on a deprivation of medical care claim, a prisoner must prove three elements.  First,  "an objectively serious medical need," so grave that, "if left unattended, poses a substantial risk of serious harm."  *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (internal quotation marks, alterations and citations omitted).  "[A] serious medical need is . . . one . . . diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotation marks omitted).  The seriousness of the deprivation of medical care is measured by the detrimental effect the deprivation brought upon the person.  *Hill v. DeKalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1188-89 (11th Cir. 1994).

The second element requires "a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish."  *Taylor*, 221 F.3d at 1258.  To establish the requisite intent, "a plaintiff must demonstrate that the public official acted with an attitude of 'deliberate indifference.'"  *Id.* (quoting *Estelle v. Gamble*, 429 U.S. at 105, 97 S. Ct. at 291).  Deliberate indifference is not established "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 56 (1994)*.*  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."  *Farmer*, 511 U.S. at 842, 114 S. Ct. at 1983.  Disregard of the risk is also a question of fact that can be shown by standard

methods.  *Id.* at 846.

Obviously, a complete denial of readily available treatment for a known serious medical condition violates the Constitution.  *Harris v. Coweta Cnty.*, 21 F.3d 388, 393 (11th Cir. 1994).  Also, medical treatment can be so slight as to amount to no treatment at all.  Thus, the mere fact that treatment was provided does not end the inquiry.  *See  Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989) ("[G]rossly incompetent medical care or choice of an easier but less efficacious course of treatment can constitute deliberate indifference."); *see also Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) ("Medical treatment that is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness violates the eighth amendment.").  The prisoner must prove, however, that the officials' response was so inadequate as to "constitute an unnecessary and wanton infliction of pain" and was not "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Taylor*, at 1258.  Plaintiff must show that the challenged conduct was "very unreasonable in light of a known risk" of harm or suffering. *Hardin v. Hayes*, 52 F.3d 934, 939 (11th Cir. 1995) (citing *Farmer*, 114 S.Ct. at 1978-79).  Disputes regarding the level of treatment or the existence of other treatment options do not alone evidence cruel and unusual punishment.  *Estelle*, 429 U.S. at 107, 97 S. Ct. at 292; *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985).  Where the inmate has received medical attention and the dispute is over the adequacy of that attention, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made.  *Harris v. Thigpen*, 941 F.2d at 1507 (quoting *Waldrop v. Evans*, 871 F.2d at 1035); *see also Woody v.*

*Cronic*, 401 F. App'x. 509, 512 (11th Cir. 2010) (unpublished opinion) ("Generally, an inmate who receives a medical diagnosis and care, but desires a different diagnosis or treatment, cannot show deliberate indifference."). A difference of opinion over matters of medical judgment does not give rise to a constitutional claim. *Harris*, 941 F.2d at 1505; *Waldrop* at 1033; *Murrell v. Bennett*, 615 F.2d 306, 310 n. 4 (5th Cir. 1980). Some of the ways in which prison officials might avoid Eighth Amendment liability is to show: (1) "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger;" (2) that "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent;" or (3) that "they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 114 S. Ct. at 1982-83.

For the final element of an Eighth Amendment claim, a plaintiff must show the officials' deliberate indifference caused the plaintiff's injury. *Taylor*, at 1258; *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009) (reiterating the elements of an Eighth Amendment claim).

DR. BROWNE AND DR. HEMPHILL'S
MOTIONS FOR SUMMARY JUDGMENT

## Rule 56 Evidence

On June 22, 2005, plaintiff was hit in the head with a combination lock, causing a laceration to his head. Plaintiff was confined at South Bay at the time. (Doc. 9, p. 5; Doc. 108, Hemphill Aff. ¶ 3 and Attach. 1, pp. PHS-319-320). Nursing staff at South Bay cleansed the area, inserted four sutures, and made the doctor on duty aware of plaintiff's injury. (Doc. 9, p. 5; Doc. 108, Hemphill Aff. ¶ 3 and Attach. 1, pp. PHS-318-320). On July 6, 2005, defendant Dr. Tennenbaum saw

plaintiff for a follow-up appointment. (Doc. 9, p. 5; Doc. 108, Hemphill Aff. Attach. 1, p. PHS-318.). Dr. Tennenbaum noted: (1) that the laceration healed well, (2) that Nurse Bennett removed four sutures with a sterile disposal kit without difficulty, and (3) that plaintiff tolerated the procedure well. (Doc. 108, Hemphill Aff., Attach. 1, p. PHS-318). Dr. Tennenbaum advised plaintiff to follow up with further care as needed. (*Id*.). Plaintiff alleges that he began having severe headaches and dizzy spells, and that he notified "the medical dept." of his complaints. (Doc. 9, p. 5). Plaintiff does not specify the dates of his complaints, or who assessed him. (*Id*.). On September 2, 2005, plaintiff was seen by a nurse at sick call due to plaintiff's complaints of ringing in his ears and draining. (Doc. 108, Hemphill Aff., Attach. 1, p. PHS-317). The nurse noted that plaintiff's ears and throat appeared normal, and that his gait was steady. (*Id*.). The nurse did not observe drainage. (*Id*.). The nurse provided plaintiff a pain reliever and advised him to return if his symptoms persisted. (*Id*.). On September 8, 2005, plaintiff received a medical examination due to an impending transfer to Charlotte CI. (Doc. 107 Ex. 1 p. 1). Nurse McKeehan noted that plaintiff complained of ringing in his ears and reported that the ringing began September 2, 2005. (*Id*.). No other medical issues were noted. (*Id*.).

Upon intake at Charlotte CI on September 8, 2005, plaintiff was assessed by Nurse Durand. (Doc. 108, Hemphill Aff., Attach. 1, pp. PHS-313-315). Plaintiff's vital signs were normal. (Hemphill Aff. ¶ 4 and Attach. 1, pp. PHS-313-315). Nurse Durand noted that plaintiff was oriented as to person, place, time and situation, and that he exhibited cooperative behavior. (*Id*.). Plaintiff denied having any current medical complaints. (*Id*., p. PHS-313). Plaintiff alleges in his second amended complaint that he "complained to the Medical Dept. of his conditions.

Notwithstanding per the directions of the Staff Doctor/Chief Medical Officer, Plaintiff was denied an examination, and given ibuprofen." (Doc. 9, p. 5). Plaintiff's medical records refute this allegation.  Plaintiff's medical records establish that plaintiff was seen by Dr. A. K. Jani on September 13, 2005, for a follow-up ear evaluation. (Doc. 108, Hemphill Aff.,¶ 5 and Attach. 1, pp. PHS-311-312). Plaintiff complained of having headaches and dizzy spells for the past month, and of an ear infection lasting three weeks. (*Id*., p. 312).  Plaintiff also reported that he had chest pain and that he was struck in the head with a lock. (*Id*.).  Plaintiff denied vomiting and nausea. (*Id*.).  Dr. Jani assessed plaintiff for possible head trauma. (*Id*.). Plaintiff's pupils responded appropriately and equally to light. (*Id*.).  Dr. Jani diagnosed hypertension and an ear infection, and directed plaintiff to lower his salt content and drink 8-10 glasses of water per day. (*Id*., pp. 311-312).  Dr. Jani prescribed an antibiotic (Bactrim) for the ear infection. (*Id*.).  Dr. Jani ordered an EKG (to detect possible heart problems), a blood draw (for a complete blood count, comprehensive metabolic panel, and testing for hepatitis and HIV), and a urine analysis. (*Id*., p. 311; *see also* Doc. 108, Hemphill Aff. ¶ 5 and Doc. 107, Zeide Aff. ¶ 6(d)).  Dr. Hemphill was not involved in the care or treatment of plaintiff during the September 13, 2005 visit.  Dr. Hemphill reviewed plaintiff's lab results on September 28, 2005, and determined that the results were clinically insignificant and did not necessitate follow-up care. (Doc. 108, Hemphill Aff., Attach. 1, p. PHS-310-311; *see also* Doc. 116, Attach. p. 1).  On October 10, 2005, plaintiff was seen by Dr. Jani for follow up on his ear infection and lab work. (Doc. 108, Hemphill Aff.¶ 6 and Attach. p. PHS-308).  Plaintiff did not voice any complaints at that time. (*Id*.).

On October 16, 2005, plaintiff declared a medical emergency with complaints of dizziness and vomiting. (Doc. 108, Hemphill. Aff. ¶ 7 and Attach. 1, p. PHS-307). Plaintiff was examined by Nurse Veigel. (*Id*.). Plaintiff reported that he had been dizzy 2-3 times per week since he was hit in the head with a lock on June 22, 2005. (*Id*.). Nurse Veigel noted that plaintiff was alert and oriented to person, place and time; that plaintiff's gait was steady; that plaintiff's speech was not slurred; that plaintiff had experienced no additional head trauma since June 22nd; and that plaintiff did not report ear discomfort. (*Id*.). Nurse Veigel determined that plaintiff's condition was not emergent, and that no treatment was required. (*Id*.). Nurse Veigel directed plaintiff to increase his fluid intake, and educated plaintiff on the signs and symptoms of infection. (*Id*.). Dr. Hemphill states in his affidavit, and plaintiff provides no medical evidence to dispute, that at the time of plaintiff's October 16, 2005 examination plaintiff did not demonstrate any symptoms of head injury, trauma to the brain, or the need for emergency treatment. (Doc. 108, Hemphill Aff. ¶ 8).

Plaintiff did not verbalize any further complaints of headaches or dizziness until June 21, 2006, although he was seen for other health matters. (Doc. 108 Hemphill Aff., Attach. 1, pp. PHS-35, 302-306) On June 21, 2006, Nurse Almeida conducted a periodic evaluation of plaintiff. (*Id*., p. PHS-35). Plaintiff stated that his health was good except that he had headaches from when he was hit with a lock. (*Id*.). Plaintiff's blood pressure was elevated. (*Id*.). Blood was drawn for lab work to screen for abnormalities. (*Id*.). Dr. Hemphill states in his affidavit, and plaintiff provides no medical evidence to dispute, that headaches are a nonspecific symptom that can have many different causes, including high blood pressure, and that high blood pressure can also cause dizziness and nausea. (Doc. 108, Hemphill Aff. ¶ 8).

Three days later on August 22, 2006, plaintiff was transferred to Everglades CI.  As part of the transfer, Nurse Almeida at Charlotte CI completed a Health Information Transfer Summary.  (Doc. 108, Hemphill Aff., Attach. 1, pp. PHS-300).  Nurse Almeida noted that lab results were pending.  (*Id*.).  No other medical issues were noted.  (*Id*.).

On August 25, 2006, a nurse at Everglades CI conducted an intake examination of plaintiff to screen for current health issues and complaints.  (Doc. 108, Browne Aff. ¶ 3 and Attach. 1, pp. PHS-300-301).  Plaintiff's vital signs were normal.  (*Id*.).  Plaintiff was oriented to person, place, time and situation, and was cooperative.  Plaintiff did not report any current medications or current medical complaints.  (*Id*.).  Defendant Dr. Browne assessed plaintiff on August 25, 2006.  (Browne Aff. ¶ 3 and Attach. 1, p. PHS-301).  Plaintiff reported to Dr. Browne that he suffered a head injury from a lock in June of 2006 (a month before), not June of 2005.  (*Id*.).  Dr. Browne noted that post-traumatic syndrome and post-concussion syndrome were potential diagnoses.  (*Id*.).  Drs. Browne and Hemphill state in their affidavits, and plaintiff presents no medical evidence to dispute, that post-concussion syndrome is a disorder in which a combination of post-concussion symptoms, such as headaches, dizziness, fatigue, insomnia, irritability, and sensitivity to light, occur.  (Doc. 108, Browne Aff. ¶ 4; Hemphill Aff. ¶ 9).  These symptoms may last for weeks and sometimes months after the concussion.  Concussions themselves are a mild traumatic brain injury, usually occurring after a blow to the head.  (*Id*.).  Generally, post-concussion syndrome symptoms occur in the first 7-10 days after the injury and abate within 3 months, although occasionally they can persist for one year.  (*Id*.).  No test can confirm or diagnose post-concussion syndrome.  (*Id*.).  The only treatment in

these cases for the actual injury is time.  (*Id*.).  Doctors focus on managing the symptoms.  (*Id*).  In the case of headaches, patients are provided the general analgesics typically used to treat such situations, including Tylenol, Motrin, or in extreme cases, anti-depressants.  (*Id*.).  Dr. Browne did not treat plaintiff for post-concussion syndrome on August 25, 2006, because plaintiff did not complain of any active symptoms at that time.  (Doc. 108, Browne Aff. ¶ 5).

On September 6, 2006, plaintiff presented at sick call with complaints of occasional dizziness and headaches.  (Doc. 108, Browne Aff., Attach. 1, p. PHS-298).  Nurse Noel assessed plaintiff.  (*Id*.).  Plaintiff reported to Nurse Noel that he was struck on the head with a metal lock in June of 2006, and that he experienced headaches and dizziness since that time. (*Id*.).  Nurse Noel observed no abnormalities on plaintiff's head.  Plaintiff denied any dizziness or discomfort at that time.  (*Id*.).  Nurse Noel referred plaintiff to medical for further evaluation, and directed plaintiff to obtain Tylenol from the dormitory officers to treat his headaches.  (*Id*.).  Dr. Browne states in his affidavit, and plaintiff provides no medical evidence to dispute, that the symptoms plaintiff reported on September 6, 2006 would not lead any medical professional to believe that plaintiff had a serious medical need at that time, or was suffering an emergent condition requiring immediate treatment.  (Doc. 108, Browne Aff. ¶ 6).

On September 26, 2006, plaintiff presented at sick call with complaints of dizziness and a headache.  (Doc. 108, Browne Aff., Attach. 1, p. PHS-297).  Nurse Noel assessed plaintiff.  (*Id*.).  Plaintiff reported to Nurse Noel that he had experienced headaches and dizziness since being struck on the head with a metal object in June of 2006.  (*Id*.).  Plaintiff reported that he was not in distress at that

time, but that the symptoms came and went.  (*Id*.).  Nurse Noel confirmed that plaintiff was on the schedule to see medical for further evaluation.  Dr. Browne states in his affidavit, and plaintiff provides no medical evidence to dispute, that the symptoms plaintiff reported on September 26, 2006 would not lead any medical professional to believe that plaintiff had a serious medical need at that time, or was suffering an emergent condition requiring immediate treatment.  (Doc. 108, Browne Aff. ¶ 7).   Approximately twenty minutes later, plaintiff returned to medical, complaining of frequent dizziness, numbness in his left arm and leg, and pain in his left shoulder.  (Doc. 108, Browne Aff., Attach. 1, p. PHS-295)  Plaintiff reported that he fell because his arm and leg went numb.  (*Id*.; *see also* Doc. 115, Attach. Formal Grievance Log #0610-401-074).  Plaintiff was assessed by Nurse Jarrett.  (*Id*.).  This time plaintiff reported that he was hit on the head in June of 2005.  (*Id*.).  Nurse Jarrett immediately referred plaintiff to defendant Dr. Browne.  (*Id*., Browne Aff. ¶ 8 and Attach. 1, p. PHS-295).  Dr. Browne evaluated plaintiff.  (*Id*., pp. PHS-295-296).  Plaintiff reported that he drank 12 cups of water per day.  (*Id*.).  Dr. Browne observed that plaintiff's urine was so diluted it appeared clear.  (*Id*.).  Dr. Browne states in his affidavit, and plaintiff provides no medical evidence to dispute, that over-hydration is more common than generally thought, and that it leads to hyponatremia, or low blood sodium.  (Browne Aff. ¶ 8).  Symptoms of hyponatremia include headache, nausea, dizziness, confusion, agitation, vomiting, trouble breathing, coma and epilepsy-like seizures.  (*Id*.).  Dr. Browne recommended that plaintiff decrease his water intake until his urine was amber, which would resolve the low sodium issue.  (*Id*. and Attach. 1, pp. PHS-295).  Dr. Browne recommended Tylenol for plaintiff's headaches, which was available from plaintiff's dorm officers.  (*Id*.).  Dr. Browne did

not see anything that led him to conclude plaintiff suffered some type of acute or chronic injury to his head requiring immediate treatment.  (*Id*.).

On October 17, 2006, plaintiff submitted a formal grievance complaining that when he told Dr. Browne of his June 26, 2005 head injury and subsequent headaches and dizziness, Dr. Browne advised plaintiff that his condition was normal. (Doc. 115, Attach., Formal Grievance Log #0610-401-074).  Plaintiff sought to "find out what the problem is about my head." (*Id*.).  Dr. Browne responded:

> You were advised that you now have post traumatic/post concussion syndrome.   There is no treatment and thus only symptomatic intervention.  You are not and cannot be placed in any chronic clinics. However, each time you present to medical you will be charged. Tylenol can be obtained from the dorm officer.

(*Id*.).

On November 20, 2006, plaintiff was involved in an altercation with another inmate. (*Id*. ¶ 9 and Attach. 1, p. PHS-292).  Plaintiff was assessed by Nurse Jarrett. Nurse Jarrett noted swelling on the right side of plaintiff's forehead and two small abrasions at the base of plaintiff's neck. (*Id*.).   Plaintiff denied any dizziness or loss of consciousness from the fight. (*Id*.).  Plaintiff's hand grips were strong and equal. (*Id*.).  Plaintiff was kept in the medical area for monitoring. (*Id*.).  Plaintiff's vital signs were normal. (*Id*.).  Plaintiff was alert and oriented, and his neuro-checks were negative. (*Id*.).  The swelling on plaintiff's forehead decreased. (*Id*.).  Plaintiff was released back into the general population. (*Id*.).  Dr. Browne states in his affidavit, and plaintiff provides no medical evidence to dispute, that there was no evidence plaintiff suffered an acute injury to his head requiring additional treatment. (*Id*.).  Dr. Browne further states, and plaintiff provides no medical evidence to dispute, that at no time during Dr. Browne's treatment of plaintiff at Everglades CI did plaintiff

exhibit symptoms requiring specialized treatment or testing for his dizziness and headaches.  (Doc. 108, Browne Aff. ¶ 9).  On December 15, 2006, plaintiff was transferred back to Charlotte CI.  (Doc. 108, Hemphill Aff., Attach. 1, p. PHS-287).  Dr. Browne did not see plaintiff again.  (Doc. 108, Browne Aff. ¶ 10).  A Health Information Transfer Summary form was completed by Nurse Jamerson at Everglades CI.  (Doc. 108, Hemphill Aff., Attach. 1, p. PHS-287).  No medical issues were noted. (*Id.*).

On December 15, 2006, a nurse at Charlotte CI conducted an intake examination on plaintiff to screen for current health issues and complaints.  (*Id.*, pp. PHS-286-288).  Plaintiff's vital signs were normal.  (*Id.*).  Plaintiff did not report any current medications or current medical complaints.  (*Id.*).

On March 12, 2007, plaintiff was assessed by Nurse Veigel.  Plaintiff reported having headaches, dizziness, right neck pain and left side pain.  (*Id.*, p. PHS-281).  At the time of the appointment plaintiff was experiencing left side pain and a headache in the top of his head.  (*Id.*).  Plaintiff had no neurological deficit.  (Doc. 108, Hemphill Aff. ¶ 10 and Attach. 1, p. PHS-281).  Plaintiff was alert and oriented to person, place, time and situation.  (*Id.*).  Plaintiff did not have slurred speech, and his gait was steady.  (*Id.*).  Dr. Hemphill states in his affidavit, and plaintiff presents no medical evidence to dispute, that plaintiff did not have any evidence of head trauma or injury that required treatment.  (Doc. 108, Hemphill Aff. ¶ 10).  Nurse Veigel educated plaintiff on the benefits of exercise, recommended that plaintiff quit doing his "jumping jacks" and recommended that plaintiff perform range of motion ("ROM") exercise, particularly stretching, to address his pain management.  (*Id.* and Attach. 1, p. PHS-281).

In light of plaintiff's continued complaints of problems arising from his 2005 head injury, Dr. Hemphill performed a full physical examination of plaintiff on March 22, 2007.  (Hemphill Aff. ¶ 11 and Attach. 1, pp. PHS-279-280).  Plaintiff reported occasional dizziness, particularly when he got up in the morning.  Plaintiff denied taking medication and denied other medical problems.  (*Id.*).  Dr. Hemphill's examination was negative for evidence of head injury.  (*Id.*).  Plaintiff ambulated well, was alert and in no apparent distress, and his pupils responded correctly to light.  (*Id.*).  Dr. Hemphill's examination of plaintiff's skull was unremarkable.  (*Id.*).  Dr. Hemphill performed a range of motion examination on plaintiff's neck.  Plaintiff had full ROM forward and backwards, but his side to side ROM was somewhat limited to 80% and 90%, respectively.  (*Id.*).  Plaintiff did not complain of pain during the exam and did not have a cervical spasm.  (*Id.*).  Dr. Hemphill ordered a skull x-ray and blood work to screen for any additional problems, but his examination was unremarkable, leading Dr. Hemphill to suspect that plaintiff's complaints involved psychological factors rather than physical.  (*Id.*, pp. PHS-281, 345).  Dr. Hemphill prescribed pain medication.  (*Id.*, p. PHS-345).

Plaintiff's skull was x-rayed on March 27, 2007.  (*Id.*, p. PHS-278).  The results were normal.  (*Id.*, p. PHS-443).  Plaintiff left Charlotte CI on December 24, 2007, and Dr. Hemphill did not see plaintiff again.  (Hemphill Aff. ¶ 11 and Attach. 1, p. PHS-272).

As will be discussed later in conjunction with defendants Nguyen and Nichols' motion for summary judgment, plaintiff continued to complain of headaches, neck pain and numbness after he left Charlotte CI.  (Doc. 108, Hemphill Aff. ¶ 12 and Attach. 1, pp. PHS-267, 273).  In January of 2008, plaintiff was diagnosed with

moderately severe osteoarthritis – also called degenerative arthritis – in his neck, but no acute abnormality. (Hemphill Aff. ¶ 12 and Attach. 1, p. PHS-439). In 2010, plaintiff was diagnosed with severe cervical spine stenosis, the narrowing of the spinal canal. (*Id*. ¶ 12 and Attach. 1, p. PHS-113). Plaintiff received cervical decompression surgery for the stenosis on November 10, 2010. (*Id*., and Attach. 1, p. PHS-55). Dr. Hemphill states in his affidavit, and plaintiff presents no medical evidence to dispute, that the June 2005 head injury could not have caused either the arthritis or stenosis, because these are chronic degenerative conditions. (Hemphill Aff. ¶ 12). Dr. Hemphill further states that nothing in his March 22, 2007 examination alerted him to either the osteoarthritis or stenosis. (*Id*.). Dr. Hemphill looked specifically for reduced ROM and pain in plaintiff's neck, and plaintiff had no pain on palpation, no spasms, and his ROM was within normal limits or close thereto. (*Id*.). Dr. Hemphill states, and plaintiff does not dispute, that occasional dizziness and headaches are not symptoms typical for either osteoarthritis or cervical stenosis. (*Id*.). Dr. Hemphill presents the medical opinion of Dr. Michael Zeide, an orthopedic surgeon who reviewed plaintiff's medical records for the period September 8, 2005 to December 31, 2005. (Doc. 107, Zeide Aff. ¶ 5(a). Dr. Zeide attests, and plaintiff offers no medical evidence to dispute, that: (1) plaintiff's medical records do not demonstrate that plaintiff had any symptoms of head injury, trauma to the brain, or need for emergency treatment during his confinement at Charlotte CI, and (2) plaintiff's medical records do not demonstrate that an alleged lack of medical treatment at Charlotte CI in any way caused or contributed to plaintiff's complaints of headaches or dizziness. (*Id*., Zeide Aff. ¶ 6(j) and (k)).

<u>Application of Summary Judgment Standard to Rule 56 Evidence</u>

Plaintiff claims that defendant Dr. Hemphill was deliberately indifferent to his serious medical needs when Hemphill failed to conduct a neurological examination after plaintiff complained of headaches and dizziness and informed Charlotte CI staff of his 2005 head injury.  (Doc. 9, pp. 5-6).  Plaintiff further claims that Dr. Hemphill's response to plaintiff's complaints – ordering an x-ray of plaintiff's skull and prescribing Ibuprofen – was objectively unreasonable.  (*Id.*).

The summary judgment evidence demonstrates that during plaintiff's confinement at Charlotte CI, plaintiff was examined every time he complained of headaches and dizziness, and that one or more of the examinations included neurological assessment and assessment for acute head injury or brain trauma. Although plaintiff was not referred to a neurologist, the undisputed testimony <u>of four doctors</u> establishes that plaintiff did not exhibit symptoms of an acute head injury, neurological trauma, or brain trauma warranting specialized testing for his dizziness and headaches, specialized treatment for his dizziness and headaches, or the need for evaluation by a neurologist.  (Doc. 108, Hemphill Aff. ¶¶ 7, 12; Doc. 108, Browne Aff. ¶ 9; Doc. 107, Zeide Aff. ¶ 6(j); Doc. 118, Ex. C, Hercule Aff. ¶ 5).  Plaintiff has not countered this evidence with medical evidence establishing a genuine issue for trial on whether his headaches and dizziness warranted a referral to a neurologist.

As to Dr. Hemphill's treatment, the medical evidence demonstrates, and plaintiff presents no medical evidence to dispute, that to the extent plaintiff may have suffered post-concussion syndrome, Dr. Hemphill provided adequate means for plaintiff to manage his symptoms with analgesics such as Ibuprofen and Tylenol. (Doc. 108, Browne Aff. ¶ 4; Hemphill Aff. ¶ 9).  To the extent plaintiff implies that

Dr. Hemphill should have detected plaintiff's osteoarthritis and stenosis, the record could not lead a rational trier of fact to find for plaintiff. The medical evidence demonstrates that nothing in Dr. Hemphill's evaluation of plaintiff alerted Hemphill to plaintiff's osteoarthritis or stenosis. Dr. Hemphill looked specifically for reduced ROM and pain in plaintiff's neck, but plaintiff's ROM was within normal limits or close thereto. Plaintiff's occasional dizziness and headaches are not symptoms typical for either osteoarthritis or cervical stenosis. Plaintiff's submission of MRI results from tests conducted on his cervical and lumbar spine in 2011 (doc. 116, Attach.), do not permit a reasonable jury to find that Dr. Hemphill knew in 2007 that plaintiff may have osteoarthritis or cervical stenosis. Nor do the MRI results reasonably support an inference that Hemphill knew in 2007 that his assessment of plaintiff was incorrect or his treatment grossly inadequate.

Viewing the summary judgment evidence in the light most favorable to plaintiff, the Court concludes: (1) that there is no genuine dispute as to any material fact and (2) that a rational trier of fact could not conclude Dr. Hemphill was deliberately indifferent to plaintiff's medical complaints. Dr. Hemphill is entitled to summary judgment.

Plaintiff claims defendant Dr. Browne was deliberately indifferent to plaintiff's serious medical needs when Browne diagnosed plaintiff with post-concussion syndrome, advised plaintiff that there was no treatment for his condition, and "refus[ed] to treat plaintiff's neurological damage." (Doc. 9, p. 6). The medical evidence demonstrates that Dr. Browne evaluated plaintiff's complaints and, based on plaintiff's symptoms, reasonably diagnosed plaintiff as possibly suffering from post-concussion syndrome or over-hydration. Plaintiff provides no medical evidence

from which it could reasonably be inferred that Dr. Browne knew this assessment was incorrect or his treatment grossly inadequate. The medical evidence further establishes, and plaintiff provides no medical evidence to dispute, that there is no treatment for post-concussion syndrome.

As to Dr. Browne's failure to treat plaintiff's alleged "neurological damage," the medical evidence demonstrates that: (1) plaintiff did not suffer neurological damage as a result of the 2005 head injury, and (2) plaintiff's present conditions – degenerative arthritis and cervical stenosis – are unrelated to the head injury. Plaintiff's unsupported allegation that he suffered "neurological damage" as a result of the June 2005 head injury does not raise a genuine factual dispute as to plaintiff's condition or the adequacy of Dr. Browne's care.

Viewing the summary judgment evidence in the light most favorable to plaintiff, the Court concludes: (1) that there is no genuine dispute as to any material fact and (2) that a rational trier of fact could not conclude Dr. Browne was deliberately indifferent to plaintiff's medical complaints. Dr. Browne is entitled to summary judgment.

## DR. NGUYEN AND NURSE NICHOLS' MOTION FOR SUMMARY JUDGMENT

Defendants Nguyen and Nichols seek summary judgment on the basis of qualified immunity. (Doc. 118, pp. 22-24).

Qualified Immunity Standard

The doctrine of qualified immunity is a guarantee of fair warning. *McElligott v. Foley,* 182 F.3d 1248, 1260 (11th Cir. 1999). Qualified immunity shields government officials from individual capacity suits against them for acts that do not violate a clearly established constitutional right of which a reasonable person would

be aware given the circumstances and information possessed by the official at the time of the conduct. *Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002); *Conn v. Gabbert,* 526 U.S. 286, 119 S. Ct. 1292, 1295, 143 L. Ed. 2d 399 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). Qualified immunity ensures that individuals can reasonably anticipate when their conduct may give rise to liability. To that end, liability attaches only if the contours of the right allegedly violated are sufficiently clear that a reasonable person would understand that what he is doing violates that right. *McElligott*, 182 F.3d at 1260 (citing *United States v. Lanier,* 520 U.S. 259, 270, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997)). A public official seeking qualified immunity "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.*

Courts apply a two-pronged test when evaluating a claim of qualified immunity: (1) whether, on the facts alleged, a constitutional right was violated; and (2) whether the right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). The court may exercise its discretion in deciding which of the two prongs should be addressed first in light of the circumstances in the particular case at hand. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009). The court may grant qualified immunity if the plaintiff fails to carry his burden on either of the two prongs. *See, e.g., Pearson*, 129 S. Ct. at 822-23 (evaluating only *Saucier*'s second prong and holding

that law enforcement officers were entitled to qualified immunity because the unlawfulness of their conduct was not clearly established).

Rule 56 Evidence Concerning Dr. Nguyen's Care

Plaintiff left Charlotte CI on December 24, 2007, and was transferred to Franklin CI.  (Doc. 9, p. 6; Doc. 108, Hemphill Aff. ¶ 11 and Attach. 1, p. PHS-272). Plaintiff was treated at Franklin CI by defendant Dr. Adam and other medical staff. Plaintiff's second amended complaint claims that defendant Dr. Adam was deliberately indifferent to plaintiff's serious medical needs when Adam diagnosed plaintiff as suffering from arthritis and "denied a neurological exam and continued [plaintiff] on Ibuprofen."  (Doc. 9, p. 6).  Plaintiff's claims against Dr. Adam were dismissed on September 26, 2011, for failure to state a claim.  (Doc. 129).  The following evidence is provided to evaluate plaintiff's claims concerning his subsequent treatment by Dr. Nguyen at Union CI.

In January of 2008 while plaintiff was housed Franklin CI, plaintiff was referred for x-rays of his spine after he complained of numbness in his hands and left side.  (Doc. 118, Ex. C, Hercule Aff. ¶ 7; and Ex. D, Nguyen Aff. at Ex. 4).  On January 25, 2008, plaintiff's cervical and lumbar spine were x-rayed.  As noted above, the x-rays showed moderately severe diffuse osteoarthritis ("OA") in plaintiff's cervical spine with large anterior spurs.  (*Id.*).  Plaintiff also had mild degenerative joint disease ("DJD").  (*Id.*).  No acute abnormality was found. Regarding plaintiff's lumbar spine, plaintiff had diffuse DJD, and moderately severe DJD at L4-S1.  Plaintiff also had OA of the lubrosacral junction.  (*Id.*).  According to the undisputed medical evidence, osteoarthritis – also known as degenerative joint disease – is a chronic condition usually brought on with age, and is characterized by

degeneration of the cartilage in the joints.  OA in a patient's spine, particularly in conjunction with bone spurs, can put pressure on the nerves in the spinal column which often causes weakness and pain in the arms or legs.  (Doc. 118, Ex. D, Hercule Aff. ¶ 7 and Ex. D, Nguyen Aff. ¶ 5).  Additional x-rays of plaintiff were completed on April 25, 2008, following a puncture wound to plaintiff's right shoulder.  (*Id.*; *see also* Nguyen Aff. Ex. 4).  Plaintiff's right shoulder showed mild OA of the shoulder joints.  (*Id.*)  No acute fracture, dislocation, or soft tissue abnormalities were noted. An x-ray of plaintiff's chest showed mild thoracic DJD with scoliosis.  (*Id.*). Scoliosis is a condition where the spine is curved from side to side.  (*Id.*).

Plaintiff transferred to Union CI on June 20, 2008.  (Doc. 9, p. 6; Doc. 118, Ex. D, Nguyen Aff. ¶ 3 and Ex. 1).  Plaintiff alleges that he went to sick call and was seen by defendant Dr. Nguyen.  (Doc. 9, p. 6).  Plaintiff does not identify the date of this visit, but plaintiff's medical records establish that prior to any examination by Dr. Nguyen, plaintiff was seen three times by other medical staff.  (Doc. 118, Ex. E, p. 1).  The first time, June 25, 2008, plaintiff went to sick call complaining that he was stabbed by another inmate on April 23, 2008 and that his shoulder hurt.  (*Id.*). Plaintiff also complained that his left shoulder went numb and his knee hurt.  (*Id.*). Plaintiff reported that these problems were ongoing.  (*Id.*).  Nursing staff noted that plaintiff had full range of motion in his left shoulder and there was no swelling, redness or drainage in his shoulder or knee.  (*Id.*).  Plaintiff's chart was referred to a doctor for renewal of plaintiff's prescription for Ibuprofen.  (*Id.*).  Dr. Nazareno renewed the Ibuprofen prescription.  (*Id.*).

On July 14, 2008, plaintiff went to sick call stating that he needed to see a doctor about numbness in his hands.  Plaintiff also reported that he limped when he

walked.  (*Id*., Ex. E, p. 2).  (*Id*.).  Plaintiff told staff that these problems began on April 23, 2008.  (*Id*.).  Nursing staff noted that plaintiff ambulated to the clinic and had a steady gait with a limp.  (*Id*.).  Plaintiff had limited range of motion to his left shoulder, with no redness, swelling or drainage.  (*Id*.).  Plaintiff had limited range of motion to his left knee, with no redness, swelling or drainage.  (*Id*.).  Plaintiff's chart was referred to a doctor for an appointment due to the frequency of plaintiff's sick call visits.  (*Id*.).  Plaintiff saw Dr. Espino on August 11, 2008, who noted that plaintiff was not in acute distress and was able to walk straight.  (*Id*., Ex. E, p. 3).  Plaintiff was alert and coherent during the examination.  (*Id*.).  There was no obvious muscle wasting and no signs of weakness in plaintiff's upper extremities.  Plaintiff had good range of motion in his lower extremities and no obvious neurological deficits.  (*Id*.).  Plaintiff walked with no foot drop.  (*Id*.).  Dr. Espino reviewed plaintiff's 2008 diagnosis with OA, and recommended that plaintiff continue with Ibuprofen.  (*Id*.).

On October 14, 2008, plaintiff went to sick call complaining of joint pain, headaches and dizziness.  (*Id*., Ex. E, p. 4).  Plaintiff also complained of numbness and tingling in his arms from his elbows to his fingers.  (*Id*.).  Nursing staff noted that plaintiff ambulated to the clinic and was not in acute distress.  (*Id*.).  Plaintiff had a steady gait with no limp.  (*Id*.).  Plaintiff had reduced range of motion in his neck and left shoulder.  (*Id*.).  Nursing staff provided plaintiff with an analgesic balm and instructed plaintiff to perform range of motion exercise to improve mobility in his joints.  (*Id*.).

On November 7, 2008, plaintiff went to sick call where he was evaluated by a nurse.  (Doc. 118, Ex. D, Nguyen Aff. ¶ 3 and Ex. 2).  Plaintiff complained that his

ribs and chest hurt on his right side.  (*Id*.).  Plaintiff said he thought it had something to do with his arm and hand going numb.  (*Id*.).  Plaintiff also stated that the Ibuprofen he was prescribed was not helping.  (*Id*.).  The nurse noted that plaintiff was ambulatory and his respiration unlabored.  (*Id*.).  The nurse gave plaintiff an analgesic balm and advised plaintiff to return to sick call if there was no improvement in his symptoms.  (*Id*.).  Plaintiff's chart was referred to the doctor for an appointment due to plaintiff's complaint that Ibuprofen was not relieving his pain.  (*Id*.).  Dr. Nguyen received that referral.

Dr. Nguyen examined plaintiff on November 26, 2008.  (Doc. 118, Ex. D, Nguyen Aff. ¶ 4 and Ex. 3).  Dr. Nguyen noted that plaintiff had full range of motion in his shoulder with no apparent deformity and no swelling.  (*Id*.).  Plaintiff's arm and hands were unremarkable.  (*Id*.).  Plaintiff had full range of movement in his neck, but stated he felt pain when moving his neck.  (*Id*.).  Plaintiff did not present with any neurological symptoms.  (Doc. 118, Nguyen Aff. ¶ 6).  Dr. Nguyen reviewed the results of plaintiff's x-rays taken on January 25, 2008, and April 25, 2008.  (*Id*.).  Based on Dr. Nguyen's examination of plaintiff and review of plaintiff's medical file, Dr. Nguyen determined that the pain and numbness in plaintiff's arm and hands was due to the osteoarthritis in plaintiff's neck.  (Doc. 118, Ex. D, Nguyen Aff. ¶ 5 and Ex. 3).  As noted previously, plaintiff does not genuinely dispute that OA and DJD can cause numbness and pain due to increased pressure on the patient's spinal nerves. (Doc. 118, Ex. D, Nguyen Aff. ¶ 5 and Ex. C, Hercule Aff. ¶ 7).  Nothing in Dr. Nguyen's examination of plaintiff or review of plaintiff's records indicated a need to refer plaintiff to a neurologist.  (Nguyen Aff. ¶ 6).  Dr. Nguyen prescribed 800 mg Ibuprofen twice a day for 30 days and 150 mg Zantac twice a day for four weeks.

(Doc. 118, Ex. D, Nguyen Aff. ¶ 5 and Ex. 3).  Dr. Nguyen states, and plaintiff provides no medical evidence to dispute, that anti-inflammatory drugs such as Ibuprofen are the standard treatment for pain associated with arthritis.  (*Id*.).  Dr. Nguyen advised plaintiff to return to the clinic as needed.  (*Id*.).  The parties do not dispute that this was the only time Dr. Nguyen treated plaintiff.  (Doc. 118, Ex. D, Nguyen Aff. ¶ 6 and Ex. 3).  Plaintiff was transferred from Union CI on January 20, 2009.  (Doc. 118, Ex. D, Nguyen Aff. ¶ 1 and Ex. 1).

<u>Application of Summary Judgment Standard to Rule 56 Evidence</u>

Plaintiff claims Dr. Nguyen was deliberately indifferent to plaintiff's serious medical needs when Nguyen "refused to examine or order a neurological exam, and instead advised plaintiff the loss of approximately 50% of his dexterity, motor skills, and range of motion was due to his age (44) and arthritis."  (Doc. 9, p. 6).  The undisputed medical evidence demonstrates that Dr. Nguyen had an opportunity to examine plaintiff only once, and that Dr. Nguyen examined plaintiff at that time.  The undisputed medical evidence further demonstrates that:  (1) plaintiff's numbness and pain was consistent with plaintiff's OA and DJD, (2) nothing in plaintiff's medical records or Dr. Nguyen's examination indicated a need to refer plaintiff to a neurologist, and (3) plaintiff did not present with any neurological symptoms when Dr. Nguyen examined him in November of 2008.  Plaintiff fails to produce evidence establishing a genuine issue for trial concerning Dr. Nguyen's care.

Viewing the summary judgment evidence in the light most favorable to plaintiff, the Court concludes:  (1) that there is no genuine dispute as to any material fact and (2) that a rational trier of fact could not conclude Dr. Nguyen was deliberately indifferent to plaintiff's medical complaints.  Dr. Nguyen is entitled to

summary judgment.

Rule 56 Evidence Concerning ARNP Nichols' Care

Plaintiff was transferred from Union CI to Santa Rosa CI on January 20, 2009. (Doc. 118, Ex. D, Nguyen Aff. at Ex. 1, p. 2).  On February 18, 2009, Nurse Nichols assessed plaintiff after he presented to sick call complaining of pain on the entire left side of his body.  (Doc. 118, Ex. F, Nichols Aff. ¶ 3 and Ex. 1, p. 2).  Nurse Nichols observed plaintiff walk into the examination room, and noted that plaintiff ambulated slowly without any foot drop.  (*Id*.).  Nurse Nichols states, and plaintiff presents no medical evidence to dispute, that foot drop is a symptom that would indicate a neurological problem, and is evidenced by the patient dragging his foot when walking.  (Doc. 118, Ex. F, Nichols Aff. ¶ 3).  Plaintiff stated that he could not sit on the exam table, and that his whole body had been out of joint for one year.  (*Id*.). Because this was Nurse Nichols' first encounter with plaintiff, Nichols gave plaintiff the benefit of the doubt regarding his alleged inability to negotiate the table.  (*Id.*). Nurse Nichols performed a standing examination, which was adequate for assessing plaintiff's complaints of pain.  (*Id*.).  Nichols examined plaintiff's back and noted there was questionable muscle tightness on the left side.  (*Id*.).  Nurse Nichols reviewed plaintiff's medical file and noted the results of his 2008 x-rays and diagnosis of arthritis.  (Nichols Aff. ¶ 4).  Nurse Nichols discontinued plaintiff's prescription for Motrin because plaintiff stated it was not helping him, and prescribed Flexeril twice a day for 10 days as a trial.  (Nichols Aff. ¶ 4 and Ex. 1, p. 2).  Flexeril is a muscle relaxer used to treat pain. (*Id.*).  Nichols advised plaintiff to take over-the-counter Tylenol for additional pain relief.  (*Id*.).

On March 19, 2009, plaintiff went to sick call complaining of pain in his left

side, numbness in his hands and arms, and that his knee was giving out.  (Doc. 118, Ex. F, Nichols Aff. at Ex. 3, p. 1).  Plaintiff stated he had been having the problem for a long time.  (*Id*.).  Nurse Raines examined plaintiff, noting that he ambulated to the clinic guarding his left side.  Nurse Raines also noted there was no edema, and no decrease in neurological signs.  Nurse Raines reviewed plaintiff's chart and noted his OA, DJD and bone spurs.  (*Id*.).  Raines referred plaintiff to a physician for his complaints of weakness, numbness, and his knee popping out.  (*Id*.).

On March 25, 2009, ARNP Nichols saw plaintiff at sick call.  (Nichols Aff. ¶ 5 and Ex. 3, p. 2).  Plaintiff complained of weakness in his left knee and numbness.  (*Id*.).  Plaintiff alleges that he advised ARNP Nichols that he could not get on the exam table without help; that an officer approached plaintiff to assist him; and that Nichols stopped the officer, stating:  "If he can't get up there on his own take him back to his cell."  (Doc. 9, p. 6 (continuation page)).  ARNP Nichols states in her affidavit that plaintiff refused to get on the exam table and refused to even attempt to step up on the step leading to the table.  (Doc. 118, Ex. F, Nichols Aff. ¶ 6).  Unlike the first exam where plaintiff's complaints of left side pain could be assessed while plaintiff stood, plaintiff's new complaints of weakness and numbness in his knee required plaintiff to sit on the exam table so that Nichols could examine the knee without plaintiff bearing any weight on that leg and so that Nichols could perform range of motion and reflexive exercises.  (*Id*.).  ARNP Nichols reviewed plaintiff's medical file and noted that nothing in the file or in her observation of plaintiff indicated he could not get on the exam table.  (Nichols Aff. ¶ 7).  Nichols advised plaintiff that if he would not allow her to examine him he would deemed as refusing medical care and returned to his cell.  (*Id*.).  ARNP Nichols states, and plaintiff does

not dispute, that with the exception of a custodial hold or in an emergency situation, correctional officers are not allowed to place their hands on an inmate for any reason. (*Id*.).   Doing so would be considered a use of force.   (*Id*.).   Nichols states that if plaintiff had a medical condition that prevented him from getting on the table, she would have assisted him herself, but since the objective findings in plaintiff's medical file did not indicate plaintiff had a medical condition preventing him from stepping up and getting on the table, Nichols directed that plaintiff be returned to his cell without examination or treatment.  (*Id*.).

On April 4, 2009, April 28, 2009, and May 5, 2009, plaintiff presented to sick call and was assessed by other nursing staff who sent plaintiff back to his cell without examination or treatment due to his refusal to get on the exam table.  (Doc. 118, Ex. F, Nichols Aff. at Ex. 3, pp. 2-3).

On November 18, 2009, Nurse Nichols evaluated plaintiff for a low bunk pass due to his arthritis and complaints of pain.  (Nichols Aff. ¶ 8 and Ex. 4).  Plaintiff ambulated slowly and negotiated the exam table with some difficulty, but was able to get on the table.  (*Id*.).  Nurse Nichols did not see any evidence of back spasms. (*Id*.).  Nurse Nichols wrote plaintiff a pass for a low bunk on a low tier, so he would not have to climb stairs to get to his cell.  (*Id*.).  Nichols also prescribed plaintiff 200 mg Clinoril twice a day for 30 days and prescribed an analgesic balm for plaintiff's joint pain.  (*Id*.).  Clinoril is a non-steroidal anti-inflammatory drug used to treat inflammation and is typically prescribed for pain, including pain associated with arthritis.  (*Id*.).  Nichols advised plaintiff to tell her if the Clinoril worked for him and if not, noted that she would try Motrin or Naprosyn.  (*Id*.).

The parties do not dispute that the three physical examinations outlined above

were the only physical exams Nurse Nichols performed on plaintiff.  (Doc. 118, Ex. F, Nichols Aff. ¶ 9 and Ex. 4).  Plaintiff was transferred from Santa Rosa CI to Okaloosa CI on December 22, 2009, and Nurse Nichols did not see plaintiff again. (Doc. 118, Ex. D, Nguyen Aff. at Ex. 1, p. 2).

Nurse Nichols provides the following additional evidence of plaintiff's medical treatment occurring after plaintiff left her care.  On April 27, 2010, plaintiff received an MRI due to plaintiff's increasing complaints of weakness and numbness.  (Doc. 118, Ex. C, Hercule Aff. ¶ 9; Doc. 118, Ex. G).  The medical evidence demonstrates, and plaintiff does not dispute, the following.  The MRI showed complex calcified disc herniation at C2-C4 and spinal cord compression.  (*Id*.).  Plaintiff was referred to the Jacksonville Memorial Hospital for a neurology consult.  (*Id*.).  Additional testing showed that plaintiff has severe cervical spinal canal stenosis from C2 through C5.  (*Id*.).  Surgery was recommended to correct the stenosis.  (*Id*.).  Other than the stenosis, plaintiff did not present with any other neurological issues, such as constant headaches, reported memory loss or loss of consciousness.  (*Id*.).  Cervical stenosis is a narrowing of the spinal canal in the neck area, which compresses the spinal cord.  (Doc. 118, Ex. C, Hercule Aff. ¶ 10).  A herniated disc means that the discs in the spine protrude and are out of place, which compresses the nerves in the spinal column.  (*Id.*).  On November 10, 2010, plaintiff had cervical decompression surgery to correct the stenosis.  (Doc. 118, Ex. C, Hercule Aff. ¶ 11).  At a follow-up appointment with the surgeon in December 2010, plaintiff reported that his strength and pain had improved.  (*Id*.).  Plaintiff continues to be monitored and treated by the neurologists at Jacksonville Memorial Hospital.  (*Id*.).  The diagnoses of osteoarthritis and cervical stenosis are not evidence of a purported head trauma.  (*Id*.).  These are

not spinal changes that would be caused by being hit in the head with a lock.  (*Id*.).
OA and cervical stenosis are chronic, degenerative conditions.  (*Id*.).  There is
nothing in the record to objectively reflect that plaintiff's pain, weakness and
numbness were caused by a head injury in June of 2005.  (*Id*.).

Application of Summary Judgment Standard to Rule 56 Evidence

Plaintiff claims Nurse Nichols was deliberately indifferent to his serious
medical needs when she refused plaintiff medical care at the March 25, 2009, sick
call visit, failed to refer plaintiff to a doctor or neurologist for his complaints, and
prescribed Ibuprofen and muscle relaxers, which were ineffective.  (Doc. 9, p. 6
(continuation page)).  The undisputed medical evidence reveals that plaintiff actually
underline could get on the exam table, albeit with difficulty.  Thus, a reasonable jury could not
find that Nurse Nichols violated the Eighth Amendment when she deemed plaintiff's
refusal to attempt the exam table as a refusal of medical care.  As to Nurse Nichols'
treatment at other times, Nurse Nichols' evidence demonstrates that she responded
reasonably to plaintiff's medical complaints.  Nichols responded to plaintiff's initial
complaints of pain by examining him and reviewing his medical file.  Based on
plaintiff's complaints, his diagnosis of osteoarthritis and his report that Motrin was
ineffective, Nichols prescribed plaintiff a different analgesic (Tylenol) for pain.
Nichols also prescribed a muscle relaxer based on her observation of muscle
tightness.  Plaintiff provides no evidence from which a reasonable jury could infer
that Nurse Nichols knew this treatment posed a substantial risk of harm to plaintiff,
or knew that her assessment of plaintiff's condition was grossly inadequate.  As to
Nichols' final treatment in November , the medical evidence demonstrates that
plaintiff presented with more complaints of pain associated with his arthritis.  Nurse

Nichols responded by prescribing plaintiff a different drug used to treat arthritic pain, and told plaintiff to advise her whether or not it worked for him.  Again, plaintiff provides no evidence from which a  reasonable jury could infer that Nurse Nichols knew this treatment posed a substantial risk of harm to plaintiff, knew that her assessment of plaintiff's condition was grossly inadequate, or knew that plaintiff had a serious medical need to see a neurologist.

Viewing the summary judgment evidence in the light most favorable to plaintiff, the Court concludes:  (1) that there is no genuine dispute as to any material fact and (2) that a rational trier of fact could not conclude Nurse Nichols was deliberately indifferent to plaintiff's medical complaints.  Nurse Nichols is entitled to summary judgment.

## CONCLUSION

Reduced to their essence, plaintiff's deliberate indifference claims amount to nothing more than plaintiff's disagreement with medical professionals' medical judgments.  Disagreement with a prison doctor's medical judgment cannot form the basis of an Eighth Amendment claim.  *See Harris v. Thigpen*, 941 F.2d at 1505 ("[A] simple difference in medical opinion between the prison's medical staff and the inmate" regarding the course of treatment does not state an Eighth Amendment claim."); *Adams v. Poag*, 61 F.3d 1537, 1545 (11th  Cir. 1995) "[W]hether governmental actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment.") (quotation marks omitted); *see also, e.g., Smith v. Fla. Dep't of Corr.*, 375 Fed. Appx. 905, 910 (11th  Cir. 2010) (unpublished opinion)  ("Smith's claim rests on his

difference of opinion with the prison medical staff over the course of his treatment, which does not rise to the level of an Eighth Amendment violation."). Plaintiff insists that he suffered neurological damage from being hit in the head in June of 2005, but the medical evidence demonstrates otherwise. To the extent plaintiff has "neurological damage," the overwhelming medical evidence demonstrates that such damage was the result of plaintiff's osteoarthritis, degenerative joint disease and cervical stenosis – chronic degenerative conditions unrelated to a head injury. The record taken as a whole could not lead a rational trier of fact to find for plaintiff on any of his claims against defendants Hemphill, Browne, Nguyen or Nichols.

Accordingly, it is respectfully RECOMMENDED:

1. That defendants' motions for summary judgment (docs. 107, 108, 118) be GRANTED.

2. That this case be referred to the undersigned for further proceedings on plaintiff's individual capacity claims against the remaining defendant, Dr. Tennenbaum.

3. That upon disposition of plaintiff's claims against Dr. Tennenbaum, the Court enter final judgment in favor of defendants Hemphill, Browne, Nguyen and Nichols on plaintiff's individual and official capacity claims.

At Pensacola, Florida this 23rd day of December, 2011.

*/s/ Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *Se*e 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).